Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/03/2019 09:10 AM CDT

State of Nebraska, appellee, v.
Dallas L. Huston, appellant.
___ N.W.2d ___

Filed February 8, 2019.    No. S-18-145.

1. **Postconviction: Evidence: Witnesses: Appeal and Error.** In an evidentiary hearing on a motion for postconviction relief, the trial judge, as the trier of fact, resolves conflicts in the evidence and questions of fact. An appellate court upholds the trial court's factual findings unless they are clearly erroneous.

2. **Effectiveness of Counsel.** A claim that defense counsel provided ineffective assistance presents a mixed question of law and fact.

3. **Effectiveness of Counsel: Appeal and Error.** When reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error. With regard to questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), an appellate court reviews such legal determinations independently of the lower court's conclusion.

4. **Effectiveness of Counsel: Proof: Words and Phrases: Appeal and Error.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. To show prejudice under the prejudice component of the *Strickland* test, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability does not require that it be more likely than not that the deficient performance altered the outcome of the case; rather, the defendant must show a probability sufficient to undermine confidence in the outcome.

5. **Effectiveness of Counsel: Proof.** The two prongs of the ineffective assistance of counsel test under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), may be addressed in either order.

6. **Evidence: Words and Phrases.** Unfair prejudice speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged, commonly on an emotional basis.

7. **Rules of Evidence: Police Officers and Sheriffs.** Statements made by law enforcement in the course of interviewing suspects may be admissible for the purpose of providing necessary context to a defendant's statements in the interview which are themselves admissible.

8. ____: ____. In order to determine whether a statement made by law enforcement is admissible to provide context, the probative value of the statements of both the defendant and the officer must be assessed.

Appeal from the District Court for Lancaster County: John A. Colborn, Judge. Affirmed.

Timothy S. Noerrlinger for appellant.

Douglas J. Peterson, Attorney General, and Stacy M. Foust for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ.

Papik, J.

Dallas L. Huston was convicted by a jury of second degree murder and sentenced to 50 years' to life imprisonment. We affirmed his conviction and sentence on direct appeal. See *State v. Huston*, 285 Neb. 11, 824 N.W.2d 724 (2013) (*Huston I*). After Huston's motion for postconviction relief was denied without an evidentiary hearing, we affirmed in part. See *State v. Huston*, 291 Neb. 708, 868 N.W.2d 766 (2015) (*Huston II*). However, with respect to claims that Huston's trial counsel was ineffective for failing to properly object to the admission of certain portions of recorded interviews between Huston and police, we reversed, and remanded

for an evidentiary hearing. The case returns to us now after the district court held an evidentiary hearing and denied Huston's motion for postconviction relief. We affirm.

## BACKGROUND

We provided a full recitation of the facts regarding this case in *Huston I*. We summarize facts relevant to this appeal in the sections below.

### Investigation of Ryan Johnson's Death.

Huston and Ryan Johnson "were living together as a couple in a nonsexual relationship" at the time of Johnson's death. *Huston I*, 285 Neb. at 12, 824 N.W.2d at 728. In September 2009, Huston called the 911 emergency dispatch service, claiming that he had walked into the room he and Johnson shared and found Johnson wrapped in a blanket with plastic wrap covering his face. Paramedics performed lifesaving measures but were unable to revive Johnson.

Police later began to investigate whether Huston was responsible for Johnson's death. Police received information that Huston had told Nicholas Berghuis and Christopher Wilson, friends of Johnson and Huston, that one of Huston's "personalities" had played a role in Johnson's death by wrapping Johnson's face in plastic wrap and putting a pillow over Johnson's face as Johnson tried to breathe. *Id.* at 13, 824 N.W.2d at 728. While Huston purported to make statements and to have performed actions as a different personality, he later admitted that he did not have multiple personality disorder, that he made up all of the different personalities as part of a "'social experiment,'" and that "he controlled them completely." *Id.*

Berghuis and Wilson agreed to cooperate with police in an attempt to conduct surveillance on Huston. On October 6 and 7, 2009, Berghuis and Wilson invited Huston to Wilson's apartment, where a camera was concealed. On the first night, Wilson wore a wire, and on the second, Berghuis did. Police

monitored the audio and video surveillance in unmarked cars near the residence. On the second night, Huston, purporting to act as one of his personalities, admitted that on the morning of Johnson's death, he wrapped Johnson in a blanket; wrapped plastic wrap around Johnson's face; and, as Johnson broke through the plastic wrap and opened his mouth, held a pillow over his head and listened to Johnson's last heartbeats "'with enjoyment.'" *Id.* at 14, 824 N.W.2d at 728.

Police questioned Huston later in the evening of October 7, 2009. Huston initially denied involvement in Johnson's death. He then began to discuss a dream he had been having in which one of his personalities sat on top of Johnson, wrapped plastic wrap around Johnson's face, and suffocated Johnson with a pillow after Johnson broke through the plastic wrap. Later in the same interview, Huston admitted that the events were not a dream and that he physically aided in Johnson's death.

In an interview the next day, Huston first tried to retract these statements. Later, however, Huston stated that he was tired of fighting and that Johnson's death had occurred just as Huston had told Berghuis: Johnson was wrapped tightly in a blanket with his hands in his pockets, Huston wrapped Johnson's face with plastic wrap, and Huston covered Johnson's face with a pillow to make sure he died.

In an October 10, 2009, interview, Huston made additional statements about Johnson's death. Huston said that he has a morbid fascination with death, that he has urges to kill those to whom he is sexually attracted, and that Johnson and Wilson helped him deal with those urges by role playing in mock death performances. Huston said that Johnson used Huston's urges against him to convince Huston to help him commit suicide. Huston discussed the way he felt after putting a pillow over Johnson's face as Johnson tried to breathe, explaining that it did not provide the feeling he had expected. Huston also stated that he had fought his urges for most of his life and that he feared he might hurt someone else in the future.

Huston was ultimately arrested and charged with second degree murder. Huston pleaded not guilty, and the case proceeded to trial.

*Trial.*

At trial, Wilson and Berghuis testified about the statements Huston made to them concerning his role in Johnson's death. Wilson testified that he and Huston engaged in role playing in which Huston, acting as one of his personalities, would pretend to kill Wilson. Wilson also testified that Huston, purporting to act as one of Huston's personalities, had told Wilson approximately 6 months prior to Johnson's death that Johnson might die soon and that Huston would need somebody "to be there for him."

In addition, the State introduced the surveillance video and recordings of numerous interviews between Huston and police. The recordings included the statements from Huston summarized above, as well as several exchanges at issue in this appeal that are discussed further in the analysis section below.

The State also introduced a video found on Huston's computer. The video was filmed several weeks after Johnson had attempted suicide in March 2009. In the video, Huston pretends to kill Johnson by suffocating him with a pillow. The State also called a forensic pathologist who testified to his opinion that the cause of Johnson's death was suffocation.

Huston testified in his own defense. He disavowed his earlier statements admitting to restraining Johnson and suffocating him with a pillow. Huston claimed that he did not remember having any involvement in Johnson's death, but that he came to believe dreams he had been having to that effect. Huston testified that upon having the opportunity to review police reports after his confessions, he determined that he had not done what he had previously admitted doing. He testified that he had no involvement in Johnson's death and that Johnson must have wrapped himself in a blanket and covered his own face with plastic wrap.

The jury found Huston guilty of second degree murder. Huston was sentenced to 50 years' to life imprisonment.

*Direct Appeal.*

On direct appeal, Huston, represented by new counsel, argued that the court erred in admitting certain evidence and that if the issue was not preserved for appeal, Huston's trial counsel was ineffective for failing to object at trial and thus preserve the issue. See *Huston I*. The evidence at issue was in exhibits 38, 81, and 95, each of which were video recordings of police interviews with Huston.

We held that Huston's trial counsel did not preserve his evidentiary objections for appeal and that the record was not sufficient to adequately review his ineffective assistance of counsel claim. See *Huston I*. As a result, Huston's conviction and sentence were affirmed.

*Postconviction Proceedings.*

Huston filed a pro se motion for postconviction relief, asserting ineffective assistance of trial and appellate counsel in various respects. The district court denied Huston's motion without an evidentiary hearing, and Huston appealed. See *Huston II*. We affirmed in part. However, we also determined that the district court, with respect to the assertion that Huston's trial counsel was ineffective in not properly objecting to portions of exhibits 38, 81, and 95, erred by denying relief without an evidentiary hearing. We reversed, and remanded with directions to hold an evidentiary hearing on that issue. See *Huston II*.

Upon remand, the district court held an evidentiary hearing. Following the evidentiary hearing, the district court again denied Huston's motion. The district court found that Huston had failed to establish deficient performance or prejudice, as required under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The district court found that trial counsel's performance was not deficient, because

both parties and the court believed that trial counsel had preserved the issues for appeal. The district court also found no prejudice, because either the statements at issue were admissible at trial or, alternatively, their admission would have amounted to only harmless error. Huston appeals.

## ASSIGNMENT OF ERROR

Huston assigns that the district court erred in denying his motion for postconviction relief.

## STANDARD OF REVIEW

[1] In an evidentiary hearing on a motion for postconviction relief, the trial judge, as the trier of fact, resolves conflicts in the evidence and questions of fact. An appellate court upholds the trial court's factual findings unless they are clearly erroneous. *State v. McGuire*, 299 Neb. 762, 910 N.W.2d 144 (2018).

[2,3] A claim that defense counsel provided ineffective assistance presents a mixed question of law and fact. *Id.* When reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error. With regard to questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland*, an appellate court reviews such legal determinations independently of the lower court's conclusion. *McGuire, supra.*

## ANALYSIS

[4,5] Huston's postconviction motion alleges that he received ineffective assistance of counsel. To prevail on a claim of ineffective assistance of counsel under *Strickland*, the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Taylor*, 300 Neb. 629, 915 N.W.2d 568 (2018). To show prejudice under the prejudice component of the *Strickland* test, the defendant must demonstrate a

reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different. *Taylor, supra.* A reasonable probability does not require that it be more likely than not that the deficient performance altered the outcome of the case; rather, the defendant must show a probability sufficient to undermine confidence in the outcome. *Id.* The two prongs of this test may be addressed in either order. See *id.*

With these principles in mind, we turn to Huston's specific claims of ineffective assistance of counsel. Huston asserts that his counsel provided ineffective assistance by failing to preserve an objection to certain portions of exhibits 38, 81, and 95, all of which are recorded interviews of Huston conducted by police.

*"Serial Killer" Conversation.*

We begin with Huston's claim that his counsel provided ineffective assistance by failing to properly object to a portion of one law enforcement interview of Huston in which Huston expressed fear about his future dangerousness and admitted that he had wondered in the past if he were a serial killer. The portion of the interview at issue was conducted by Sgt. Gregory Sorensen and went as follows:

[Huston]: . . . [T]his is what I meant though when I've told everybody that I want to get help. I never thought this could happen and now that this has happened, I am so scared that I'm capable of doing it again.

[Sorensen]: Yeah, I think that that's probably really true.

[Huston]: And that scares me to death because, like I said, I have never thought of myself as a violent person and now I don't know what to think of myself.

[Sorensen]: Well especially when you consider that . . . you have urges to kill the people that you're attracted to.

[Huston]: And I've done everything that I could for the last, you know, if . . . you know, the earliest memories

I have of this are say 9, 10 years old so . . . 18 years I have fought myself.

[Sorensen]: But most serial killers do the same thing at some point in time.

[Huston]: Oh wow.

[Sorensen]: At some point in time, they crossed that line. I mean when you talk about . . .

[Huston]: [Interrupting.] I've asked myself that.

[Sorensen]: Whether you['re] a serial killer?

[Huston]: Uh-hum (yes). I've asked myself that . . . you've asked me if I have been suicidal in the past.

[Sorensen]: Yeah[.]

[Huston]: To be completely honest I lied to you. Because of this, I have been. I have thought about killing myself so I wouldn't hurt anyone.

Later in the same interview, Huston stated, "I am so scared now that this could happen again."

Huston objects to two aspects of the above exchange. He contends that the probative value of his own statements in the exchange are outweighed by the danger of unfair prejudice and thus inadmissible under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016). Additionally, he contends that Sorensen's reference to "serial killers" was not probative of any issue.

With respect to Huston's claim regarding his own statements in the above exchange, we do not believe his counsel performed deficiently. His statements occurred after he had admitted to law enforcement that Johnson died after Huston wrapped plastic wrap around his face and held a pillow over Johnson's head until his heart stopped beating. We find Huston's statement that he was scared he might do this again and his admissions that he has urges to kill people to whom he is attracted and that he had wondered whether he is a serial killer to all be probative of the central issue in the case—whether Huston intentionally caused Johnson's death.

[6] And while such evidence was certainly harmful to Huston's case, most, if not all, evidence offered by a party is calculated to be prejudicial to the opposing party. *State v. Oldson*, 293 Neb. 718, 884 N.W.2d 10 (2016). Rule 403 allows for exclusion only if the probative value of evidence is substantially outweighed by the danger of *unfair prejudice*. Unfair prejudice speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged, commonly on an emotional basis. *Oldson, supra.* Given Huston's own admissions about his involvement in Johnson's death and the fact that the conversation sheds light on the key issue of whether Huston intentionally caused Johnson's death, we do not consider the probative value of this evidence to be outweighed by the danger of unfair prejudice. Because any objection to Huston's own statements would not have been successful, trial counsel did not perform deficiently by not making such an objection. See *State v. Newman*, 300 Neb. 770, 916 N.W.2d 393 (2018).

[7,8] As for Huston's claim regarding Sorensen's statements in the exchange, we reach the same conclusion. We have recognized that statements made by law enforcement in the course of interviewing suspects may be admissible for the purpose of "providing necessary context to a defendant's statements in the interview which are themselves admissible." *State v. Rocha*, 295 Neb. 716, 740, 890 N.W.2d 178, 199 (2017). In order to determine whether a statement made by law enforcement is admissible to provide context, the probative value of the statements of both the defendant and the officer must be assessed. See *id.*

As we have explained, Huston's admissions were highly probative of the issues in the case, certainly more relevant than mere denials of criminal activity we found relevant in *Rocha*. Additionally, Sorensen's statements are highly relevant, because Huston's statements took place in a conversation and would make little sense without Sorensen as a conversation partner. For similar reasons to those outlined above, we also

do not believe the probative value of Sorensen's statements is outweighed by the danger of unfair prejudice. Because this evidence was admissible, Huston's counsel did not perform deficiently by failing to preserve an objection to them. See *Newman, supra*.

*Sorensen's Opinion That Huston*
*Committed Murder.*

Next, Huston claims he is entitled to postconviction relief on his claim that his counsel was ineffective for failing to preserve an objection to a portion of an interview in which Sorensen stated a belief that Huston committed murder and not assisted suicide. Huston argues this evidence should have been excluded as inadmissible opinion testimony.

Huston's postconviction motion is not entirely clear as to the specific statement of Sorensen to which he claims his counsel deficiently failed to preserve an objection. Exhibits 81 and 95 do contain several exchanges in which Sorensen made statements about the nature of Huston's involvement with Johnson's death. In an interview conducted on October 7, 2009, the following dialogue took place:

[Sorensen]: . . . [Y]ou or [one of your personalities] were the person or persons that killed [Johnson]. And, maybe at the time, it started out as a suicide. But it didn't end that way. It just didn't end that way.

[Huston]: See, I don't believe that.

[Sorensen]: You don't believe that it didn't end in a homicide?

[Huston]: No, I don't.

. . . .

[Huston]: . . . [T]hey asked me that. They asked me that. Did he fight? Did he . . .

[Sorensen]: [Interrupting.] He doesn't have to fight. All he had to do was break the seal, all he had to do was try to breathe, and . . . that was his intent to stay alive. He tried to br[eathe].

Later, in the same interview, Sorensen stated, "[W]hen you put the pillow over his face, you are killing him. He's not killing himself, you're killing him."

On October 10, 2009, Huston and Sorensen had the following conversation after Huston asserted that he "didn't murder [Johnson]":

> [Sorensen]: . . . [B]ut I don't know how else you can describe it. . . . This isn't . . . assisting a suicide. This . . . this is just not assisting a suicide. . . . I don't know if you can understand this, but if [Johnson] looks at me right now and he says . . . I can't take it anymore, you got to kill me and I pull a gun out and I shoot him dead.
>
> [Huston]: You've tried to say that before and I do understand what you mean.
>
> [Sorensen]: [Johnson's] just asked me to kill him and I don't have that right to do that. He can ask me all he wants, but I don't have the right to do it. And this isn't any different . . . I know that you think that it is, but it's not.

Huston argues that Sorensen's statements that Huston committed murder were inadmissible, because the statements were not based on Sorensen's personal knowledge and constituted opinion testimony of Huston's guilt. However, for reasons explained below, even assuming this evidence was inadmissible, we do not believe Huston has demonstrated he was prejudiced by his counsel's failure to properly object to it.

Sorensen's statements that Huston killed Johnson or committed murder were based on Huston's admissions. At the time Sorensen made them, Huston had admitted to restraining Johnson, wrapping his face in plastic wrap, and covering his head with a pillow until he stopped breathing. Huston, however, continued to insist that these acts did not amount to murder. Sorensen's statements addressed the question of what crime Huston had committed if Huston had, in fact, done what he had admitted doing. At trial, however, Huston did not take the position that the actions he had admitted taking did not

amount to second degree murder. Rather, he changed course and denied any involvement in Johnson's death.

The basic question before the jury was thus whether to believe Huston's numerous admissions that he wrapped Johnson's face with plastic wrap and placed a pillow over Johnson's head until his heart stopped beating or to believe his later claim made at trial that he did not actually do what he had previously admitted doing. The jury's verdict shows it believed Huston's admissions and not his attempt at trial to disavow them. Huston has not offered and neither can we discern a reason why the outcome would have been different if Sorensen's above statements had been excluded from evidence. Because Huston cannot demonstrate that he was prejudiced by any failure to object to the statements discussed above, the district court did not err in rejecting postconviction relief.

*Evidence Regarding Huston's Relationships.*

Finally, Huston contends that his counsel provided ineffective assistance by failing to preserve objections to a part of exhibit 38, an interview between Huston and police in which Huston discussed the nature of his relationship with Johnson and what Huston terms a "homosexual encounter" with Wilson. Brief for appellant at 40. In that part of the interview, Huston and an officer had the following discussion:

> [Huston]: Okay. To be completely honest, me and [Wilson] were together once. Only once uhm, it's how it came out to [Johnson] that we might have been interested in each other, but [Wilson] decided he didn't want to do that.

> [Police officer]: Okay. And was this early in your relationship with [Johnson]? Or . . .

> [Huston]: [Interrupting.] Oh, no no. [Wilson] is only been back around, see [Wilson] has only been back in the picture as a friend of ours for like a month. . . . I believe in being up front, yes, one time and only one time me

and [Wilson] were together and we, well we went to bed together, and

[Police officer]: [Interrupting.] How long ago was that?

. . . .

[Huston]: . . . Three weeks ago.

[Police officer]: So, it was pretty recent then.

[Huston]: Yep. . . . [Y]ou probably don't want to hear this, but me and [Johnson] had kind of a . . . unique relationship. . . . I know it's kind of a weird situation to be in [be]cause in the four years of our relationship, there was never anything sexual uhm, and we allowed ourselves . . . an "open relationship." We allowed ourselves what he'd call "[expletive] buddies." . . . That one and only one time that me and [Wilson] ended up . . . was kind of a heat of the moment, uhm, you know, spur of the moment type thing. . . . [W]e ended up in bed together, we kissed, we, we made out, but it never went anywhere further than that.

Huston argues that the discussion quoted above was not relevant to any issues at trial. He contends that his encounter with Wilson and the open nature of his relationship with Johnson could only have prejudiced him in the eyes of the jury. He argues that evidence of his encounter with Wilson was particularly prejudicial, because the jury also heard that Huston served as Wilson's mentor in a mentoring program several years before. Even though Wilson was 19 years old at the time of the encounter, Huston asserts that the fact that he was formerly Wilson's mentor "feels unsavory." *Id*. at 41.

We are not persuaded that Huston was prejudiced by his counsel's failure to properly object to the evidence at issue. Huston's statements about his encounter with Wilson were a very small part of lengthy interviews between Huston and law enforcement, and the recordings were just a portion of the State's overall case. Furthermore, while Huston may have served as a mentor to Wilson when Wilson was younger, Wilson was 19 years old at the time of the encounter and there

was no suggestion that Huston coerced Wilson at any point to engage in intimate activity with him.

In addition, the jury heard other evidence regarding Huston's relationship with Wilson. In particular, in one interview with police in which Huston was explaining that he engaged in role playing in which he would pretend to kill people to placate his urges to kill, he admitted that Johnson and Wilson were "prime targets for this stuff," because he had urges to kill those to whom he is physically attracted. At trial, Huston also admitted that Wilson helped him placate his urges by pretending to allow Huston to kill him because Huston was attracted to Wilson. The jury also heard another recording in which Huston told an officer, "If there was anyone who [Johnson] intended me to have a relationship with after all this, it would be [Wilson]." Given the other evidence in the record about Huston's attraction to Wilson and about Wilson and Huston's role playing in which Huston would pretend to kill Wilson because of that attraction, evidence of the specific encounter to which Huston claims his counsel should have objected did little to "alter[] the evidentiary picture." See *State v. Newman*, 300 Neb. 770, 783, 916 N.W.2d 393, 407 (2018).

In light of the nature of the evidence at issue, the other evidence in the record regarding Huston's relationship with Wilson, and the overall evidence of Huston's guilt, we find no reasonable probability that the statements noted by Huston altered the outcome. We thus reject this claim of ineffective assistance of counsel for failure to demonstrate prejudice.

## CONCLUSION

We find no merit to Huston's claims that his counsel provided ineffective assistance by failing to preserve objections to certain evidence introduced at trial. Accordingly, we affirm the order of the district court denying Huston postconviction relief.

AFFIRMED.

FREUDENBERG, J., not participating.